1
2
3
4
5
6

UNITED STATES DISTRICT COURT

7
FOR THE WESTERN DISTRICT OF WASHINGTON

8  RINKY DINK, INC., d/b/a PET STOP, a )
Washington Corporation, on behalf of itself ) NO.  12-0499-JLR
9  and all others similarly situated, )
 )
10  Plaintiff, )
 )
11  vs. ) DECLARATION OF JOANNE HENRY IN
 ) SUPPORT OF DEFENDANT CAPITAL
12  ) ADVANCE SOLUTIONS, LLC'S
CAPITAL ADVANCE SOLUTIONS, LLC, ) OPPOSITION TO PLIANTIFF'S RESPONSE
13  and JGRD, INC., B2B VOICE ) TO COURT'S ORDER TO SHOW CAUSE.
BROADCASTING, INC. and VELOCITY )
14  INFORMATION CORPORATION, )
 )
15  Defendants. )

16        I, JOANNE HENRY, declare as follows:
17

18        I am one of the attorneys for Defendant Capital Advance Solutions ("CAS") and make

19  this Declaration in support of CAS's Opposition to plaintiff's Response to the Court's Order to

20  Show Cause.

21        Attached hereto are true and correct copies of the following excerpts from the record in

22  King County Superior Court Cause No. 10-2-21906-4 between these same parties based on the

23

24  identical cause of action attempted to be pleaded here:

25

OPPOSITION TO SHOW CAUSE RESPONSE  (12-0499-JLR) -
1
L:\11422\Pleading\DeclarationOppositionOrderShowCause.doc

LAW OFFICES
SLOAN BOBRICK, P.S.
PO Box 65590    7610 - 40TH ST. W.
UNIVERSITY PLACE, WA 98464-1590
(253)759-9500
FAX (253)752-5324

1. JGRD, NC's Opposition to Class Certification, filed December 27, 2011.

2. Declaration of Charles Joseph Garis in Support of Defendant JGRD's Motion for Summary Judgment and Exhibit "F" thereto, filed December 11, 2011.

3. Defendant Capital Advance Solution's Motion for Summary Judgment, filed December 15, 2011.

4. Declaration of Max Peabody and Attachment 1 thereto, filed December 15, 2011.


I DECLARE UNDER PENALTY OF PERJURY OF THE LAWS OF THE STATE OF WASHINGTON THAT THE FOREGOING IS TRUE AND CORRECT

DATED at University Place, Washington this 8th day of May,  2012.


/s/ Joanne Henry
JOANNE HENRY, WSBA #6798



Sandra B. Bobrick , #11359
Joanne Henry, #6798
Sloan Bobrick, P.S.
7610 – 40th Street West
University Place, WA 98464
Telephone: (253) 759-9500
Fax: (253) 752-5324
E-mail:  sbobrick@sloanbobricklaw.com
          jhenry@sloanbobricklaw.com

Attorneys for Defendant Capital Advance Solutions, LLC

LAW OFFICES
SLOAN BOBRICK, P.S.
PO Box 65590    7610 - 40TH ST. W.
UNIVERSITY PLACE, WA 98464-1590
(253)759-9500
FAX (253)752-5324

1

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of May, 2012, I electronically filed the foregoing with the Clerk of the Court using CM/ECF system which will send notification of such filing to the following: Rob Williamson and Kim Williams, 17253 Agate Street NE, Bainbridge Island, WA 98110, roblin@williamslaw.com, kim@williamslaw.com, plaintiff's attorneys, and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants: N/A.

        /s/ Joanne Henry_____
        JOANNE HENRY, WSBA #6798

OPPOSTION TO SHOW CAUSE RESPONSE  (12-0499-JLR) - 3
L:\11422\Pleading\DeclarationOppositionOrderShowCause.doc

LAW OFFICES
SLOAN BOBRICK, P.S.
PO Box 65590   7610 - 40TH ST. W.
UNIVERSITY PLACE, WA 98464-1590
(253)759-9500
FAX (253)752-5324

# EXHIBIT 1

FILED

11 DEC 27 PM 12:03

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 10-2-21906-4 SEA

1

2

3

4

5

6                                              The Honorable Sharon Armstrong
7                                        December 28, 2011 (without oral argument).
                                         Rinky Dink. Inc.'s Motion to Certify Class
8
      **IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON**
9                    **IN THE COUNTY OF KING**

10    RINKY DINK, INC., d/b/a PET STOP, a        CASE NO: 10-2-21906-4 SEA
      Washington corporation, on behalf of itself
11    and all others similarly situated,          JGRD, NC.'S OPPOSITION TO CLASS
                                                  CERTIFICATION
12              Plaintiff,

13              v.

14    CAPITAL ADVANCE SOLUTIONS, LLC,
15    and JGRD, INC.,

16              Defendants.

17          The motion for class certification is untimely, violative of CR 23(c)(1) and a flagrant attempt to

18    avoid the requirements of CR 23.

19          CR (c)(1) was adopted to avoid the sort of confusion that Plaintiff seeks to visit on the

20    proceedings five weeks before the trial date of February 6, 2012.  It requires that certification be

21    accomplished "as soon as practicable" after the lawsuit commenced. The reason for this requirement

22    is set forth in part in CR 23(d) which affords opportunity to shape the course of the litigation to

23    accommodate a class action.   Plaintiff proposes to the status of the lawsuit to one of great financial

24    significance, which would give Plaintiff an enormous advantage in the conduct of the case.

25

JGRD'S OPPOSITION TO CERTIFICATION - 1
\\192.168.1.2\data\Kf\wdata\users\RLK\CLIENTS\JGRD, Inc\Rinky Dink v. Capital
Advance\Pleadings\Opposition to certification.doc

RAND L. KOLER & ASSOCIATES, P.S.
LAW OFFICES

THE BRODERICK BUILDING • PENTHOUSE SUITE
615 SECOND AVENUE • SEATTLE, WASHINGTON 98104-2203
PHONE (206) 621-6440 • FAX (206) 587-0226

The second procedural subterfuge presented by this motion is the attempt to have the class certified under CR 23 (b)(2) instead of CR 23 (b)(3) the appropriate avenue of classification. The Editorial Commentary to CR 23 Subsection (b)(2) states:

Certification under CR 23 (b)(2) is permitted when the defendant has refused to act and the class seeks final injunctive or declarative relief . Suits against public officials alleging civil or other constitutional rights violations are classic CR 23(b)(2) class actions. [*Citations omitted.*] . . . A class can be certified under CR (b)(2) even when some monetary relief is sought so long as the monetary relief is "incidental" to the request for injunctive or declaratory relief.

The Washington Practice Manual (Volume 14, Second Edition) states at page 447:

This second type of class action is most often used in civil rights suits or litigation involving constitutional issues, although any action seeking to alter the defendants conduct could potentially qualify. Typical class actions under this provisions [*sic*]are actions in which the defendant has acted in a consistent manner towards all class member so that a pattern of activity is apparent, or when the defendant has imposed a regulatory scheme that affects all class members.

The instant lawsuit involves neither a regulation, nor a pattern of activity. There were some calls over a limited period of time in 2009 that were neither preceded nor followed by other calls to this State. The calls resulted from an apparent mistake. There was no intention to make prohibited calls to Washington and there is no evidence of such intent. There is no reason to enjoin an act that was done inadvertently and which shows no pattern or likelihood of repetition.

The unlikelihood of classification under CR 23(b)(2) caused plaintiff to allege first that the class was certifiable under CR 23(b)(3) (See Second Amended Complaint, Section 4.7) then at Section 4.8 it added reference to CR 23(b)(2). Significantly there are no allegations of a continuing pattern or of any refusal to act to cease the complained of conduct. When time constraints prevented Plaintiff from seeking class certification under the appropriate subsection, it was forced to seek classification under

JGRD'S OPPOSITION TO CERTIFICATION - 2
\\192.168.1.2\data\Kfwdata\users\RLK\CLIENTS\JGRD, Inc\Rinky Dink v. Capital
Advance\Pleadings\Opposition to certification.doc

RAND L. KOLER & ASSOCIATES, P.S.
LAW OFFICES

THE BRODERICK BUILDING • PENTHOUSE SUITE
615 SECOND AVENUE • SEATTLE, WASHINGTON 98104-2203
PHONE (206) 621-6440 • FAX (206) 587-0226

Subsection (b)(2) to avoid the notice requirements of subsection (b)(3).  Granting certification would be an unwarranted reward for dilatory litigation practices.

The Second Amended Complaint's prayer for relief at paragraph B asks for unspecified "declaratory, equitable, and/or injunctive relief" to prevent conduct that is not even alleged to be a continuing pattern.  Paragraph C of the prayer asks for "$500 per message sent to Plaintiff and each member of the Class, as well as actual damages, and other damages as permitted by law."   The vague unfounded language of the prayer for equitable relief compared to the aggressive, unlimited scope of the damage claim shows that this is a very aggressive lawsuit for money damages in the thinnest of equitable clothing.

The Plaintiff suggests in its reply that these lawsuits are brought for eleemosynary purposes.  Actually CR 23(f) requires unclaimed funds from a class action to be disbursed to such a recipient or to the Legal Foundation.  It appears that a significant amount of funds are unclaimed.

Dated this 27th day of December, 2011.

RAND L. KOLER & ASSOCIATES, P.S.

/s/ Rand L. Koler
Rand L. Koler, WSBA #7679
Attorney for Defendant JGRD, Inc.

JGRD'S OPPOSITION TO CERTIFICATION - 3
\\192.168.1.2\data\Kf\wdata\users\RLK\CLIENTS\JGRD, Inc\Rinky Dink v. Capital
Advance\Pleadings\Opposition to certification.doc

RAND L. KOLER & ASSOCIATES, P.S.
LAW OFFICES

THE BRODERICK BUILDING • PENTHOUSE SUITE
615 SECOND AVENUE • SEATTLE, WASHINGTON 98104-2203
PHONE (206) 621-6440 • FAX (206) 587-0226

# EXHIBIT 2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

The Honorable Sharon Armstrong
January 6, 2012 at 10:30 A.M.
JGRD's Motion for Summary Judgment

## IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
## IN THE COUNTY OF KING

| | |
|---|---|
| RINKY DINK, INC., d/b/a PET STOP, a Washington corporation, on behalf of itself and all others similarly situated,<br><br>     Plaintiff,<br><br>     v.<br><br>CAPITAL ADVANCE SOLUTIONS, LLC, and JGRD, INC.,<br><br>     Defendants. | CASE NO: 10-2-21906-4 SEA<br><br>DECLARATION OF CHARLES JOSEPH GARIS, JR. IN SUPPORT OF DEFENDANT JGRD'S MOTION FOR SUMMARY JUDGMENT |

I, Charles Joseph Garis, Jr. declare as follows:

1.    I am over the age of eighteen years, am competent to testify as to the matters stated herein and make the declaration on my own personal knowledge.

2.    I am an owner of JGRD, Inc. ("JGRD") and have been primarily responsible for its management and operations since its commencement of business. I am aware of its policies and procedures and have searched for and reviewed all records related to the allegations of the plaintiff in this lawsuit.

DECLARATION OF JOE GARIS - 1
F:\Kfwdata\users\RLK\CLIENTS\JGRD, Inc\Rinky Dink v. Capital
Advance\Pleadings\Declaration of Garis.doc

RAND L. KOLER & ASSOCIATES, P.S.
LAW OFFICES

THE BRODERICK BUILDING • PENTHOUSE SUITE
615 SECOND AVENUE • SEATTLE, WASHINGTON 98104-2203
PHONE (206) 621-6440 • FAX (206) 587-0226

3.    JGRD operates an internet voice broadcasting service which involves telephoning recorded messages. Messages can be sent wherever there is telephone service but our business is predominantly within the United States. Our business is conducted over the internet through the use of our website by our customers. The attached **Exhibit A** is a copy of a screen image from our web site. Under the heading "Industries and Applications" is a list of the types of services performed by JGRD. These include charitable solicitations, political campaigns, advertising and generally can be used whenever anyone has a telephone message for a large number of people.

4.    JGRD is not equipped to provide telephone numbers or to make the calls. **Exhibit B** is a copy of another page on our website which shows that the user is to provide the telephone numbers to be dialed in a campaign. If the user cannot provide the numbers to be called, we ask another unrelated company to provide them for the user's campaign. The user has control of the numbers called, not JGRD. If the user wants records of the calls, we get them from the company that furnished them and forward them to the user.

5.    The calls are made by the owner of a "platform," a company that can provide telephone numbers and make calls. Until October 14, 2009 Capital Advance Solutions, campaigns were conducted exclusively by B2B Voice Broadcasting System. After that date we arranged for Capital Advance Solutions to use a different platform. Velocity Information Corp conducted the campaigns after that date.

6.    JGRD does not prepare, nor is it otherwise involved in, the content of the calls. The messages are prepared by the user. In the ordinary course of business, we have no knowledge of the content of the calls nor do we know their destination.

DECLARATION OF JOE GARIS - 2
F:\Kfwdata\users\RLK\CLIENTS\JGRD, Inc\Rinky Dink v. Capital
Advance\Pleadings\Declaration of Garis.doc

RAND L. KOLER & ASSOCIATES, P.S.
LAW OFFICES

THE BRODERICK BUILDING • PENTHOUSE SUITE
615 SECOND AVENUE • SEATTLE, WASHINGTON 98104-2203
PHONE (206) 621-6440 • FAX (206) 587-0226

7.    Our web site is "hosted" so that users may call or email to ask questions about the forms on the web site or about how the process works.  The campaign itself is entirely controlled by the user.

8.    We are quite cognizant of the need to comply with state and federal law.  When a user wishes to start a campaign, he is immediately required to agree to the "Terms of Use," before submitting any required information.  The attached **Exhibit C** is a copy of the screen showing the Terms of Use agreed to by each user, including Capital Advance Solutions, LLC. This notifies each prospective user that there are state and federal laws that apply and it contains a representation that the user has researched those laws and that the use will be in compliance with those laws.

9.    Next the user is required to indicate online its acceptance of an agreement regarding use of the services.  A copy of this agreement is attached as **Exhibit D**.  Section 11, entitled "Rules and Regulations" repeatedly mandates review of applicable laws and compliance with them.    Finally, the signed contract contains among other things representations that the user will comply with state laws.  A copy of Capital Advance Solution LLC's written contract is attached as **Exhibit E**.

10.   JGRD has a screen for each user to designate states which are not to be called. The attached **Exhibit F** is a copy of Capital Advance Solution's "do not call" list of states not to be called and the list includes Washington.

11.    To launch a campaign the user is presented with a series of screens.  Attached as **Exhibit G** is one screen seen by the user before launching a campaign.  The user is again required to assert compliance with the law.  The purpose of another of the pre-launch screens (a copy of which is attached as **Exhibit H**) is to confirm that the numbers on the "do not call

DECLARATION OF JOE GARIS - 3
F:\Kfwdata\users\RLK\CLIENTS\JGRD, Inc\Rinky Dink v. Capital
Advance\Pleadings\Declaration of Garis.doc

RAND L. KOLER & ASSOCIATES, P.S.
LAW OFFICES

THE BRODERICK BUILDING • PENTHOUSE SUITE
615 SECOND AVENUE • SEATTLE, WASHINGTON 98104-2203
PHONE (206) 621-6440 • FAX (206) 587-0226

list" are to be eliminated from the calls made in the campaign. When the screen appears before the user these boxes are checked indicating that calls should not be made to states on the "do not call" lists, but the user can delete the checks, which would be appropriate for noncommercial calls in Washington. For example these boxes might be unchecked for political calls or charitable solicitations.

12.     The information supplied by the user is compiled on a master form. Attached as **Exhibit I** are the master forms for the campaigns launched by Capital. The "do not call" lists were unchecked. This was apparently done in error as customers of JGRD which prepare these "do not call" lists do not customarily instruct that the "do not call" lists should not be used when the campaign involves commercial advertising calls, but may uncheck them when the calls are of a different nature.

13.     I have received from B2B Voice Broadcasting System -- and produced in discovery -- all records of calls made by B2B on behalf of Capital Advance Solutions, LLC. I have confirmed with B2B that the records in my possession are a complete set of the records of all calls mediated by JGRD, Inc. on behalf of Capital Advance Solutions, LLC up to October 14, 2009. This was the only platform used by Capital Advance Solutions during that time.

14.     The call that is described in plaintiff's complaint, occurring at 11:31 a.m. on October 8, 2009, if it involved JGRD, Inc. could only have been made by B2B as it provided the only platform used Capital Advance Solutions, LLC at that time. I was informed that the telephone number to which this call was made was 360.738.3663. There is no record of a call being made to that number on October 8, 2009, or on any other day up to October 14, 2009. I have been unable to obtain the records of the platform provider used after that date.

DECLARATION OF JOE GARIS - 4
F:\Kfwdata\users\RLK\CLIENTS\JGRD, Inc\Rinky Dink v. Capital
Advance\Pleadings\Declaration of Garis.doc

RAND L. KOLER & ASSOCIATES, P.S.
LAW OFFICES

THE BRODERICK BUILDING • PENTHOUSE SUITE
615 SECOND AVENUE • SEATTLE, WASHINGTON 98104-2203
PHONE (206) 621-6440 • FAX (206) 587-0226

1    I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE

2   OF WASHINGTON THAT THE FOREGOING IS TRUE AND CORRECT.

3    Signed this ___9___ day of December, 2011 in Harleysville, Pennsylvania.

4

5

6                                          Charles Joseph Garis, Jr.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DECLARATION OF JOE GARIS - 5
F:\K\wdata\users\RLK\CLIENTS\GRD, Inc\Rinky Dink v. Capital
Advance\Pleadings\Declaration of Garis.doc

RAND L. KOLER & ASSOCIATES, P.S.
LAW OFFICES

THE BRODERICK BUILDING • PENTHOUSE SUITE
615 SECOND AVENUE • SEATTLE, WASHINGTON 98104-2203
PHONE (206) 621-6440 • FAX (206) 587-0226

Tel Server Home  Setup ▸ Reports ▸ Predictive ▸ Contact ▸ Conference ▸ Tools ▸

## Do Not Call List for Capital Advance Solutions

| refresh | tasks | export | drop | add shared all | add shared parent | switch customer |
|---------|-------|--------|------|----------------|-------------------|-----------------|

| Type | Count | Modified | Exported | Shared |
|------|-------|----------|----------|--------|
| Master | 214,996,158 | 07/27/2011 14:26:45 PDT | | |
| Customer | 60,767 | 06/23/2010 12:55:49 PDT | | ☑ share with sub-customers |

| Do Not Call States | |
|----|----------------|
| CO | Colorado |
| DC | Washington DC |
| MI | Michigan |
| MS | Mississippi |
| NC | North Carolina |
| ND | North Dakota |
| WA | Washington |
| WY | Wyoming |

**Entries** | Import | DNC States

Phone#: [          ]

Response:
Timestamp:
Userstamp:

(lookup) (add) (remove) (reset)

User: Nathan Lesuer  Customer: VoiceBlaze - Master      :Capital Advance Solutions

home  customers  users  campaign  schedules  plist  vox  dnc  pay  charge  stats  logs  logout
Site: NS, Version: 1.1.086 (d1.3.142)

## EXHIBIT F

# EXHIBIT 3

The Honorable Sharon Armstrong
January 13 at 2:30 P.M.
Capital Advance Solution's Motion for Summary Judgment

## IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
## IN AND FOR THE COUNTY OF KING

| | |
|---|---|
| **RINKY DINK INC. d/b/a/ PET STOP, a Washington Corporation,**<br>                    **Plaintiff,**<br><br>           v.<br><br>**CAPITAL ADVANCE SOLUTIONS, LLC,**<br>**and JGRD, INC.**<br><br>           **Defendants.** | **NO. 10-2-21906-4 SEA**<br><br>**DEFENDANT CAPITAL ADVANCE SOLUTIONS' MOTION FOR SUMMARY JUDGMENT** |

### I.      RELIEF REQUESTED

Defendant Capital Advance Solutions (CAS) moves for summary judgment dismissal of the Class Action Allegations in Plaintiff's second amended complaint.

### II.      STATEMENT OF FACTS

This action arises out of a telephone call plaintiff Rinky Dink Inc. d/b/a Pet Stop claims

SUMMARY JUDGMENT MOTION 1

GIBSON PEABODY, P.S.
1601 Fifth Avenue, Suite 2410
SEATTLE, WASHINGTON 98101
Phone: (206) 521-6562 / Fax: (206) 521-6567

to have received on October 8, 2009.  More specifically, plaintiff alleges that on that date an employee at plaintiff's pet store in Bellingham answered a call that was placed by an automatic dialing and announcing device ("ADAD") on behalf of CAS.  Plaintiff further alleges that the call consisted of a pre-recorded message from CAS for the purpose of encouraging a person to purchase services and thus was a "commercial solicitation" in violation of RCW 80.36.400.[1]  In its second amended complaint, plaintiff pleads causes of action against CAS for violation of RCW 80.36.400, violation of RCW 19.86 and declaratory relief under the Washington Declaratory Judgment Act.  Lastly, plaintiff pleads class action allegations in its attempt to be appointed representative of a class of Washington businesses who plaintiff claims received prerecorded commercial solicitations via an ADAD from CAS.  In this motion CAS seeks only dismissal of the class action claims.

Over the last eight years, Rinky Dink, its owner Alan Gardner have been serial filers of class action litigation based upon Washington's ADAD and the Federal TCPA statutes.  State and federal court records in Washington reveal that no less than 12 such suits have been filed by plaintiff or its owner in that time.  What distinguishes the facts in this case from all other cases filed by plaintiff, however, is that in this litigation, no clear, objectively verifiable way to determine the number and identity of plaintiff's proposed class members exists and for that reason the class action claim portion the complaint should be dismissed.

CAS is a New Jersey corporation that specializes in credit card processing and accounts receivable financing.  CAS does business in all 50 states and has ongoing client relationships with numerous businesses in the state of Washington.  One of the ways it seeks to expand its

---

[1] RCW 80.36.400 provides that using an ADAD to make a "commercial solicitation" is a violation of both that statute and the Washington Consumer Protection Act and that in cases where a violation is proven, damages to the recipient of the call in the amount of $500 are presumed.

SUMMARY JUDGMENT MOTION 2

GIBSON PEABODY, P.S.
1601 Fifth Avenue, Suite 2410
SEATTLE, WASHINGTON 98101
Phone: (206) 521-6562 / Fax: (206) 521-6567

1   business is through "predictive dialing."[2]  At his deposition, Charles Betta, the president of CAS,

2   testified that beginning sometime in 2008, CAS utilized the services of a company called

3   VoiceBlaze (a/k/a/ defendant JGRD Inc.) to make predictive dialing calls to potential customers

4   in the United States.   He further testified that prior to utilizing VoiceBlaze's services to make

5   automated calls he was aware that Washington was one of a number of states that prohibited

6   calls using an ADAD machine and thus, in setting up CAS' phone campaign through VoiceBlaze

7   specifically sought to block phone numbers in the state of Washington from being called.[3]

8           In its motion for summary judgment, JGRD/VoiceBlaze explained that it did not

9   physically make the telephone calls on behalf of CAS, but rather, acted as an intermediary

10  between its clients, in this case CAS, and the company that actually placed the calls, B2B Voice

11  Broadcasting System.  Documents produced by VoiceBlaze in response to plaintiff's discovery

12  reveal that between September 16, 2009 and October 14, 2009, VoiceBlaze conducted 36

13  telephone campaigns on behalf of CAS.[4]  Additional documents in the form of B2B's phone logs

14  further reflect that, despite Mr. Bettis' intent not to make calls to the state of Washington, on

15  three days during that time period, October 7, 8 and 14, approximately 720 calls were placed to

16  numbers carrying Washington area codes.[5]  Curiously, plaintiff's number does not appear

---

[2] A predictive dialer dials a list of telephone numbers and connects answered calls to a representative of the person or company making the call. An ADAD is a form of predictive dialer.
[3] The basis for the statements concerning CAS, its business and Mr. Betta's knowledge and intent concerning calls made to Washington comes from pages 5-9 and 33-36 of the deposition of Charles Betta, attached as exhibit 1 to the declaration of Max Peabody.
[4] The 2 page document referencing the date and start and stop time of each campaign is attachment 2 to the declaration of Max Peabody.
[5] The B2B data logs identifying the Washington numbers called and the date and time of each call are attachment 3 to the declaration of Max Peabody.

SUMMARY JUDGMENT MOTION 3

GIBSON PEABODY, P.S.
1601 Fifth Avenue, Suite 2410
SEATTLE, WASHINGTON 98101
Phone: (206) 521-6562 / Fax: (206) 521-6567

1   anywhere in the list of numbers dialed by B2B, including all numbers with Washington area

2   codes dialed on October 8, 2009, the date Rinky Dink alleges it received the call from CAS.[6]

3        In order to create a class and serve as that class' representative for class action purposes,

4   Rinky Dink must demonstrate, among other things, that it can precisely define a class, based

5   upon objective, presently ascertainable facts and that it can adequately represent the members of

6   the class. Based upon the facts elicited in this litigation, Rinky Dink can do neither.

7        **III.    STATEMENT OF ISSUES**

8        Whether Rinky Dink's Class Action allegations in its second amended complaint should

9   be dismissed on summary judgment.

10

11       **IV.    EVIDENCE RELIED UPON**

12  1.   The declaration of Max Peabody and attachments thereto.

13  2.   The allegations in plaintiff's second amended complaint.

14       **V.    AUTHORITY**

15       In order to maintain a class action under Washington civil rule 23, a putative class

16  action plaintiff must demonstrate that the class it seeks to define and represent meets all of the

17  requirements of CR 23(a). In cases such as this one, where the primary relief sought is money

18  damages, the plaintiff must additionally demonstrate that the requirements of civil rule 23(b)(3)

19  are met, i.e. that questions of law or fact common to the members of the class predominate over

20

21  _____

22  [6] In his declaration in support of JGRD/VoiceBlaze's recently filed motion for summary judgment, Joseph Garis,
    JGRD's president stated that:

23        "I have confirmed with B2B that the records in my possession are a complete set of the records
          of all calls mediated by JGRD on behalf of Capital Advance Solutions up to October 14, 2009.

24        This was the only platform used by Capital Advance Solutions during that time. The call that is
          described in plaintiff's complaint, occurring at 11:31a.m., if it involved JGRD could only have
          been made by B2B as it provided the only platform used by Capital Advance Solutions at that

25        time. I was informed that the telephone number to which this call was made was 360-783-3663.
          There is no record of a call being made to that number on October 8, 2009, or on any other day
          up to October 14, 2009."

SUMMARY JUDGMENT MOTION 4

GIBSON PEABODY, P.S.
1601 Fifth Avenue, Suite 2410
SEATTLE, WASHINGTON 98101
Phone: (206) 521-6562 / Fax: (206) 521-6567

1   any questions affecting only individual members, and that a class action is superior to other

2   available methods for the fair and efficient adjudication of the controversy. (Molski v. Gleich,

3   318 F.3d 937, 947-8 (9th Cir. 2003).

4       In considering a proposed class definition, the plaintiff bears the burden of proving that

5   the class he/she proposes is, in fact, identifiable as a class. Oshana v. Coca-Cola, 472 F.3d

6   506,513 (7th Cir. (2006). Washington courts have consistently held a class may be certified

7   under CR 23 only when strict conformity with the requirements of the rule have been

8   demonstrated. Lacey Nursing Ctr., Inc. v. Washington Department of Revenue, 128

9   Wash.40,47, 905 P.2d 338,341 (1996); Schwendeman v. USAA, 116 Wash. App. 9, 17, 65 P.3d

10  1,5 (Wa.App 2003), ("trial court must engage in rigorous analysis to ensure the prerequisites of

11  the rule have been met.")  The potential for abuse of the class action process mandates that

12  "actual, not presumed conformance with CR 23" be demonstrated by plaintiff. Oda v. State, 111

13  Wash. App. 79, 92, 44 P.3d 8, 15 (2002).

14

15      The description of a proposed class must be "sufficiently definite to permit ascertainment

16  of the class members." Alliance to End Repression v. Rochford, 565 F.2d 975, 977-8 (7th Cir.

17  (1977). This requirement is necessary because class actions bind all unnamed class members.

18  Elliott v. ITT Corp., 150 F.R.D. 659, 573-4 (N.D. Ill. 1992). As stated in the Federal Manual for

19  Complex Litigation, Fourth edition, p. 270:

20

21      Defining the class is of critical importance because it identifies the
        persons (1) entitled to relief, (2) bound by a final judgment, and (3)
22      entitled under Rule 23(c)(2) to the "best notice practicable" in a Rule
        23(b)(3) action. The definition must be precise, objective, and presently
23      ascertainable.....An identifiable class exists if its members can be
        ascertained by reference to objective criteria.  The order defining the
24      class should avoid subjective standards (e.g. a plaintiff's state of mind)
        or terms that depend on the resolution of the merits. (emphasis supplied)
25

SUMMARY JUDGMENT MOTION 5

GIBSON PEABODY, P.S.
1601 Fifth Avenue, Suite 2410
SEATTLE, WASHINGTON 98101
Phone: (206) 521-6562 / Fax: (206) 521-6567

1    In the present action, plaintiff Rinky Dink seeks to define the following class:

2        All Washington businesses who received a prerecorded telephone message
         on their telephone from Defendants sent by automatic dialing machine for
3        commercial solicitation purposes, at any time for the period that begins 4
         years from the date of this complaint to trial.
4

5        The problem with plaintiff's class definition, however, is that, given the fact that Rinky

6    Dink's number does not appear on the list of numbers dialed by B2B, there is no way to

7    presently ascertain either the size of the class or the identity of the class members.  If the B2B list

8    produced by VoiceBlaze /JGRD is accurate and reflects all of the numbers called on behalf of

9    CAS through VoiceBlaze's internet portal between 9/16/09 and 10/14/09, then Rinky Dink's

10   allegation that it received an ADAD call on behalf of CAS on October 8, 2009  is refuted by the

11   database that lists the very calls plaintiff complains of.  Alternatively, if Rinky Dink's allegation

12   that it received an ADAD call from CAS on October 8, 2009 is true, it necessarily follows that

13   the phone list generated by B2B is incomplete and there is no reliable evidence which reveals

14   how many Washington phone numbers were called or what those numbers were.  In the latter

15   case, notification to class members would  require more than simply mailing a notice of the class

16   action to the registered owner of each phone number on the B2B list.  Notification would also

17   require notice by publication in an attempt to inform businesses whose phone numbers do not

18   appear on the B2B list of the pendency of the litigation. Any business owner who  comes

19   forward in response to the published notice,  would need to produce proof that he/she received,

20   via ADAD, a "commercial solicitation" as defined by RCW 80.36.400, from CAS.  Evaluating

21   the adequacy and persuasiveness of the proof would, in turn, require an individualized

22   evidentiary hearing as to each and every potential claimant whose number does not appear on the

23   B2B call list.  In short, it would defeat the purpose of a class action.

24

25

SUMMARY JUDGMENT MOTION 6

1    Given this conflict between plaintiff's allegation and the only known database reflecting

2    calls made to Washington on behalf of CAS, Rinky Dink's proposed class definition does not

3    allow for the present ascertainment of class members by reference to objective criteria.  An

4    analogous situation was presented in the case of Grimes v. Rave Motion Pictures, 264 F.R.D.

5    659 (N.D. AL 2010).  In Grimes, the plaintiff attempted to bring a class action against a theater

6    chain for alleged violations of federal FACTA law.[7]  Plaintiff's proposed class was "all persons

7    to whom Defendants provided an electronically printed purchase receipt at the point of

8    sale...which displayed more than the last five digits of the person's credit or debit card number."

9    In considering the plaintiff's request for certification, the court observed that "courts have

10   universally recognized that the first essential ingredient to class treatment is the ascertainability

11   of the class.... the named plaintiff must define the proposed class in a manner that adequately

12   identifies it members, who, exactly, are they, and how can they be located." (Id. at p.663-4).  In

13   ultimately rejecting the request for certification, the court, at page 665 of the opinion, wrote:

14

15        Grimes putative class can never be ascertained without first conducting an
          individualized inquiry into the merits of each putative class member's
16        claim.  Rave does not maintain, nor has it ever maintained, a database or
          any paper record that preserves information sufficient to allow identification
17        of any member of this proposed class. ...Rave does not retain credit card
          numbers in its files.  Copies of receipts are not generated by Rave's point of
18        sale software. ....Certification of plaintiff's class would require the court to
          examine the receipts of self-identified members of the class, whether
19        cajoled and prompted or not, in order to determine their status.  Without a
          receipt, no plaintiff would have proof of a claim, the sine qua non of class
20        membership.  Such a plaintiff by plaintiff examination would not only be a

21

22

23   _____

24   [7] FACTA provides, in part, that "no person that accepts credit cards or debit cards for the
     transaction of business shall print more than the last 5 digits of the card number...upon any
25   receipt provided to the cardholder..."

SUMMARY JUDGMENT MOTION 7

GIBSON PEABODY, P.S.
1601 Fifth Avenue, Suite 2410
SEATTLE, WASHINGTON 98101
Phone: (206) 521-6562 / Fax: (206) 521-6567

1   task beyond the court's logistical capacity, but would constitute a prohibited
2   merits based analysis.[8]

3   Closer to home, Judge Rothstein addressing a fact pattern analogous to the case at bar,
4   came to a similar conclusion in the case of  In re Phenylpropanolamine (PPA) Products Liability
5   Litigation, 214 F.R.D. 614 (W.D.Wa. 2003).  This case  involved an attempt to initiate a class
6   action on behalf of all consumers who had purchased and still possessed unused portions of non-
7   expired PPA products as of November 6, 2000, the date the FDA issued a health advisory and
8   request for voluntary withdrawal of PPA products from the market.  Plaintiffs/class
9   representatives sought refunds for class members reflecting the price of the unused portion of the
10  product as of November 6, 2000.  In denying the request for class certification, Judge Rothstein
11  initially acknowledged the "rigorous analysis" the trial court must conduct in order to determine
12  whether the party seeking class certification satisfies all of the prerequisites of CR 23. After
13  analyzing plaintiff's class definition, she found that the "manageability" problems inherent in
14  identifying the members of the proposed class argued "strongly and persuasively" against class
15  certification.  Beginning at p. 616 of the opinion, Judge Rothstein wrote:

16  "The manageability determination 'encompasses the whole range of practical
17  problems that may render the class action format inappropriate for a particular
    suit.' *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974).  Here, the court
18  finds that individualized factual inquiries required for identification of the
    proposed class would render this case unmanageable......Here, individuals
19  would be required to show some proof of injury, in this case purchase and
    possession of a non-expired PPA-containing product as of November 6, 2000,
20  in order to qualify for membership in the proposed class......Plaintiffs propose
    a proof of claim process in which class members supply either physical proof
21  of purchase and possession, such as the actual product, product packaging, or a
    receipt, or submit a certified oath or verification attesting to purchase and
22  possession as of November 6, 2000.  Plaintiffs posit that the only relevant
    question concerning their proposal would be whether or not adequate checks
23  for fraud exist at the claims processing stage.  However, the court finds itself
24

25  _____
[8] To the same effect, see also Forman v. Data Transfer 164 F.R.D. 400 (E.D. Pa. 1995).

SUMMARY JUDGMENT MOTION 8            GIBSON PEABODY, P.S.
                                     1601 Fifth Avenue, Suite 2410
                                     SEATTLE, WASHINGTON 98101
                                     Phone: (206) 521-6562 / Fax: (206) 521-6567

equally, if not more, concerned with the vagaries of memory. Six out of the eight total putative subclass representatives do not possess any physical proof that they purchased and possessed a PPA containing product as of November 6, 2000. Therefore, using the named plaintiffs as a marker, only a quarter of the class, at most, would likely possess any physical proof of purchase. A determination as to the remainder of the class would rely on the memories of those individuals as to the types, amounts and expiration dates of medication they possessed over two years ago."

In the present case, if plaintiff's allegation that it received an ADAD call from CAS on October 8, 2009 is true, the B2B phone list cannot be considered to be a reliable database given the fact that Rinky Dink's phone number is not listed in it. Absent the existence of a reliable database, due process requires that potential class membership be extended to businesses whose phone numbers are not on the B2B list. Just as in <u>Grimes</u> and the PPA litigation, to the extent that persons come forward who claim to be class members but whose phone numbers are not on the B2B list, individualized inquiry and proof of class membership by each such claimant would be required.

## VI.   CONCLUSION

Class action litigation is limited to classes which are "presently ascertainable based on objective criteria that do not require the court to delve into the merits of the claims." (McLaughlin on Class Actions, Sec. 4:2, p. 416. "Class certification is not appropriate if the court is called on to engage in individualized determinations of disputed fact in order to ascertain a person's membership in the class." <u>Grimes</u>, supra. at 665.

Given the discrepancy between plaintiff's allegations and the B2B database, Rinky Dink would presumably argue that a question of fact is raised as to whether or not it received an ADAD call from CAS as it alleges. For that reason, CAS does not seek summary judgment dismissal of Counts A and B of plaintiff's complaint. However, as indicated above, plaintiff's

SUMMARY JUDGMENT MOTION 9

GIBSON PEABODY, P.S.
1601 Fifth Avenue, Suite 2410
SEATTLE, WASHINGTON 98101
Phone: (206) 521-6562 / Fax: (206) 521-6567

1   class definition is fatally flawed and does not meet the requirements of CR 23.  In terms of

2   superiority and manageability considerations, this is not an appropriate case for a class action

3   lawsuit and Rinky Dink is not an appropriate representative of its proposed class.  For these

4   reasons, CAS asks the Court to grant its motion for summary judgment and dismiss the class

5   action allegations in plaintiff's complaint with prejudice.

6

7       **DATED:**  December 15, 2011

8

9                                                    GIBSON PEABODY, P.S.

10

11                                    By:    _____/s/_____

12                                           Max N. Peabody, WSBA #14898
                                             Attorneys for Defendant

13

14

15

16

17

18

19

20

21

22

23

24

25

SUMMARY JUDGMENT MOTION 10

GIBSON PEABODY, P.S.
1601 Fifth Avenue, Suite 2410
SEATTLE, WASHINGTON 98101
Phone: (206) 521-6562 / Fax: (206) 521-6567

# EXHIBIT 4

FILED

11 DEC 15 PM 3:21

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 10-2-21906-4 SEA

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KING

RINKY DINK INC. d/b/a/ PET STOP, a
Washington Corporation,

                Plaintiff,

    v.

CAPITAL ADVANCE SOLUTIONS, LLC,
and JGRD, INC.

         Defendants.

NO.  10-2-21906-4 SEA

DECLARATION OF MAX PEABODY

I, Max N. Peabody, declare as follows:

1.  I am counsel for defendant Capital Advance Solutions in the above entitled action.

2.  Attachment 1 to this declaration is a true and correct copy of pages 5-9 and 33-36 of the deposition of Charles Betta, President of Capital Advance Solutions.

3.  Attachment 2 to this declaration is a true and correct copy of 2 pages numbered JGRD00033-34 reflecting  all telephone campaigns run by JGRD/VoiceBlaze for Capital Advance solutions between September 16,2009 and October 14,2009.

4.  Attachment 3 to this declaration is a true and correct copy of pages JGRD0001 thru JGRD00010 reflecting the B2B telephone call logs produced by JGRD/VoiceBlaze in response to plaintiff's request for production of documents.

DECLARATION 1

GIBSON PEABODY, P.S.
1601 Fifth Avenue, Suite 2410
SEATTLE, WASHINGTON 98101
Phone: (206) 521-6562 / Fax: (206) 521-6567

1

2

3    **DATED:** December 15, 2011

4                                        GIBSON PEABODY, P.S.

5

6                                        By: _____

7                                             Max N. Peabody, WSBA #14898
                                             Attorneys for Defendant
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**DECLARATION 2**

                                        GIBSON PEABODY, P.S.
                                        1601 Fifth Avenue, Suite 2410
                                        SEATTLE, WASHINGTON 98101
                                   Phone: (206) 521-6562 / Fax: (206) 521-6567

# ATTACHMENT 1

Charles Betta                                                      November 17, 2010

Page 1

1        IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON

2            IN AND FOR THE COUNTY OF KING

3    _____

4

5    RINKY DINK, INC., d/b/a PET      )

6    STOP, a Washington corp.,        )

7    on behalf of itself and all      )

8    others similarly situated,       )   No. 10-2-21906-4 SEA

9            Plaintiffs,              )

10       vs.                          )

11   CAPITAL ADVANCE SOLUTIONS,       )

12   LLC,                             )

13            Defendant.              )

14   _____

15

16        DEPOSITION UPON ORAL EXAMINATION OF

17                CHARLES BETTA

18                (Telephonic)

19   _____

20

21            Taken at 187 Parfitt Way

22            Bainbridge Island, Washington

23

24   DATE TAKEN:   NOVEMBER 17, 2010

25   REPORTED BY:  MARY A. WHITNEY, CCR - WCRL #2728

Charles Betta                                                    November 17, 2010

---

**Page 2**

```
 1
 2              APPEARANCES
 3
 4
 5   FOR THE PLAINTIFFS:   ROBLIN J. WILLIAMSON, ESQ.
 6          Williams & Williamson
 7          187 Parfitt Way
 8          Suite 250
 9          Bainbridge Island, WA 98110
10          (206) 780-4447
11          roblin@williamslaw.com
12
13   FOR THE DEFENDANT:    MAX N. PEABODY, ESQ.
14   (Telephonic)   Gibson Peabody
15          1601 Fifth Avenue
16          Suite 2410
17          Seattle, WA  98101
18          (206) 521-6560
19          mpeabody@gibsonpeabody.com
20
21
22          -o0o-
23
24
25
```

**Page 3**

```
 1
 2        DEPOSITION OF CHARLES BETTA
 3
 4
 5        EXAMINATION INDEX
 6   EXAMINATION BY              PAGE
 7   Mr. Williamson  . . . . . . . . . . .    4
 8
 9
10        NO EXHIBITS MARKED/IDENTIFIED
11
12
13          -o0o-
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1        BAINBRIDGE ISLAND, WASHINGTON
 2        WEDNESDAY, NOVEMBER 17, 2010
 3               1:00 P.M.
 4                 -o0o-
 5   CHARLES BETTA,       witness herein, having been
 6        first duly sworn on oath,
 7        was examined and testified
 8        as follows:
 9
10             EXAMINATION
11   BY MR. WILLIAMSON:
12      Q.  Mr. Betta, would you please state your full
13   name and business address.
14      A.  Charles Betta.  Business address is
15   2068 State Highway 35, in Holmdel, New Jersey,
16   07733.
17      Q.  And Mr. Betta, you are the president of
18   Capital Advance Solutions; is that correct?
19      A.  I am.
20      Q.  How long have you been the president?
21      A.  November 2007 is when the LLC was formed.
22      Q.  And what is the business of Capital Advance
23   Solutions?
24      A.  Credit card processing and accounts
25   receivable financing.
```

**Page 5**

```
 1      Q.  And the company has been in business since
 2   November of 2007?
 3      A.  Correct.
 4      Q.  Does it do business in all of the 50 states
 5   of the nation?
 6      A.  Yes.
 7      Q.  And Mr. Horn is the CEO of the company;
 8   is that right?
 9      A.  Yes.
10      Q.  Between you and Mr. Horn, if you know,
11   which one had more contact with VoiceBlaze?
12      A.  That would be me.
13      Q.  When did you first have any contact with
14   VoiceBlaze?
15      A.  I don't have the exact dates, but I did
16   business with them for some time.  I don't have the
17   exact dates on that.
18      Q.  Okay.
19      A.  I can't tell you when we started exactly,
20   the date when -- the date of when we first brought
21   VoiceBlaze on.
22      Q.  Do you think it was sometime in 2008 rather
23   than 2009?
24      A.  2008 sounds about right.
25      Q.  All right.  How did you first learn about
```

2 (Pages 2 to 5)

Charles Betta                                                              November 17, 2010

Page 6

1  them?
2    A.  Google.
3    Q.  And when you were Googling, what were you
4  Googling for?
5    A.  Predictive dialing, voice broadcasting.
6    Q.  Prior to that search, had your company done
7  advertising to try to conduct its business by way of
8  other forms of telemarketing?
9    A.  Absolutely.
10   Q.  What kinds of things had you done before you
11  were getting in touch with VoiceBlaze?
12   A.  Mail orders, SEO optimization, cold-calling.
13   Q.  Okay.
14   A.  Basically, public records of existing
15  accounts receivable financing that was out there
16  already, things like that, but basically mailers,
17  call centers that have inbound lead traffic that come
18  to us, our business.
19   Q.  And what led you to look into the process or
20  look into using a company like VoiceBlaze? Not them
21  in particular, but the kind of service they offer.
22   A.  I'm sorry?
23   Q.  I don't mean VoiceBlaze in particular,
24  but looking into the kind of service that a company
25  like VoiceBlaze would offer.

Page 7

1    A.  Just knowing others, other people that I
2  know in different industries, who were actually using
3  it. Okay?
4    Q.  Okay.
5    A.  And more importantly, just actually doing
6  some research on it myself.
7    Q.  All right. And when you did the Googling to
8  find companies, I assume you found others than
9  VoiceBlaze?
10   A.  I did. I vetted a lot of it out and actually
11  spoke to multiple companies that do this and --
12  actually, the reason why I went to VoiceBlaze was the
13  cheapest cost.
14   Q.  And did there come a time when you reached an
15  agreement, either verbally or otherwise, with
16  VoiceBlaze that they would do work for you?
17   A.  Yes.
18   Q.  Had you talked with someone at VoiceBlaze
19  leading up to that agreement?
20   A.  I had.
21   Q.  Who was it?
22   A.  [redacted]
23   Q.  How do you spell LeSuer, if you know?
24   A.  I don't.
25   Q.  Okay.

Page 8

1    A.  Le-S-u-e-r, and that's off the top of
2  my head.
3    Q.  Did you speak with anyone else at VoiceBlaze
4  besides Mr. LeSuer?
5    A.  Basically, it was -- he was my point of
6  contact, but more importantly, if I had to have called
7  in, it was more for, you know, technical and customer
8  support --
9    Q.  Right.
10   A.  -- and I wouldn't know the names of any of
11  those individuals.
12   Q.  Did you at any time enter into a written
13  agreement with VoiceBlaze regarding the services
14  they were going to perform?
15   A.  No written agreement. Everything was
16  basically when -- when we paid, enter into the system,
17  so to speak, you have to accept the terms and
18  conditions, and by pressing the button, I guess it's
19  more like an e-signature.
20   Q.  And what were the services that VoiceBlaze
21  was going to offer?
22   A.  Voice, press 1 voice dialing, basically.
23   Q.  And what do you mean by "press 1 voice
24  dialing"?
25   A.  It's predictive voice calling that has an

Page 9

1  opt-in feature and an opt-out feature.
2    Q.  What would be the "opt-in"? What do you mean
3  by that?
4    A.  Opting in, to come into our office as an
5  interested party.
6    Q.  Okay.
7    A.  Opting out, to be put on a do-not-call list.
8    Q.  I'm used to using the term of
9  "predictive dialer" as a device that makes telephone
10  calls such that within two seconds of the recipient
11  picking up, the recipient will be connected to a live
12  operator, and if that fails, then a recording is made
13  that indicates that the operator was not available.
14  Is that what you meant similarly --
15  VoiceBlaze offered "predictive dialing services"?
16   A.  Can you repeat the question again, please.
17   Q.  Did the calls that were made on your
18  behalf by VoiceBlaze involve playing a recording that
19  the recipient would hear?
20   A.  Yes.
21   Q.  All right. And was there an understanding
22  that if the number dialed, phone number dialed, went
23  into voice mail, a recording would or would not be
24  left? If you know.
25   A.  Well, I can explain that to you very --

3 (Pages 6 to 9)

Charles Betta                                                          November 17, 2010

**Page 30**

1    email that says: I want to put some money in because
2    I want to do another set of calls?
3       A.  Yes.
4       Q.  Okay.
5       A.  Send me a link for X amount of dollars.
6       Q.  And have you tried to do that since this
7    lawsuit was filed?
8       A.  Well, I'm not going to say I've tried to do
9    that, so to speak, but I've tried to correspond with
10   VoiceBlaze via email and I've gotten no response.
11      Q.  Okay.
12      A.  Have I dangled putting, you know, money in
13   front of it? No.
14      Q.  Were the reports they would give you that
15   were on the interface about results of a particular
16   call effort printable?
17      A.  Can you repeat that question again.
18      Q.  Could you print the reports you talked about
19   earlier? Could you have printed them out?
20      A.  Could I have?
21      Q.  Yes.
22      A.  Yes. I think, yes, I could have printed them
23   out.
24      Q.  Did you ever?
25      A.  No.

**Page 31**

1       Q.  Did the reports ever say to whom the calls
2    went, the specific numbers?
3       A.  The reports would actually -- there's
4    two different types of reports that are in there.
5    The one that that we were speaking about before would
6    not have phone numbers in there. You couldn't see who
7    was dialing out on them.
8       Q.  Right.
9       A.  And then there was other reports that
10   basically would come in that -- where you could see
11   numbers that were actually coming in on a caller ID,
12   if the number was not blocked on the other end.
13      Q.  So you could see numbers of persons that
14   were calling to you?
15      A.  Only inbound.
16      Q.  Right.
17      A.  Not outbound.
18      Q.  Okay. Do you know where VoiceBlaze
19   physically was located, where it had its offices or
20   headquarters?
21      A.  I think it was Pennsylvania, but then
22   again I could be wrong. I don't know. I don't know
23   to be -- I never physically mailed anything to
24   VoiceBlaze.
25      Q.  And you talked about blocking calls to

**Page 32**

1    certain states because of concerns about civil or
2    criminal laws that forbid them. Do you recall that?
3       A.  I do.
4       Q.  I don't know if I -- you said something
5    about, We knew about "AD" calls. Is that --
6       A.  "ADAD" calls.
7       Q.  Oh, okay. ADADs. I'm sorry.
8       A.  Correct.
9       Q.  All right. Which is what you were doing?
10      A.  I'm sorry?
11      Q.  You were using VoiceBlaze to make ADAD calls,
12   correct?
13      A.  Yes.
14      Q.  And you became aware of certain states
15   where the calls should not be made; is that correct?
16      A.  Correct.
17      Q.  How did you become aware of it?
18      A.  We're a credit card processing company,
19   and these lists are provided -- actually, this list is
20   provided to us, and basically we need to abide by it,
21   you know, the provisions with VISA and MasterCard.
22      Q.  Okay. So who --
23      A.  Basically, it's on our backbone's website,
24   and we point to and we've taken it actually
25   embedded it into our dialing systems and it's

**Page 33**

1    permanent.
2       Q.  Okay.
3       A.  And it was at the time of VoiceBlaze,
4    as well.
5       Q.  You're saying that there was a list provided
6    by somebody or other that had the list of these states
7    in it?
8       A.  Yes.
9       Q.  Who provided the list?
10      A.  I'm sorry?
11      Q.  Who provided the list.
12      A.  Our backbone provider for credit card
13   processing, which is North American Bancard.
14      Q.  North American Bancard.
15      A.  Correct.
16      Q.  What does "backbone" mean in this context?
17      A.  They are the ISO, independent sales
18   organization, that houses and -- it's actually where
19   the credit card transactions are run through for
20   authorizations. So it's not VISA and MasterCard,
21   it's basically an ISO.
22      Q.  All right.
23      A.  North American Bancard is that ISO, and we're
24   a layer down from them.
25      Q.  And when you say they provided a list, was it

9 (Pages 30 to 33)

Charles Betta

November 17, 2010

**Page 34**

1  literally sending you something in the mail, was it
2  something you could print off --
3   A.  Something you could print off --
4   Q.  -- or was it on their website --
5   A.  Something you could print off their website.
6   Q.  And could one go onto that website today and
7  see what the list is?
8   A.  You would have to be an agent.
9   Q.  Pardon me?
10   A.  We would have to be an agent of.
11   Q.  Okay.  And --
12   A.  It doesn't make any sense for anybody to go
13  to a website -- I'm just explaining -- who is not an
14  agent, so --.
15   Q.  So at some point maybe even before you were
16  using VoiceBlaze, you were aware that there was this
17  list on the site?
18   A.  Absolutely.
19   Q.  And do you have a copy of that list in your
20  offices?
21   A.  We do.
22   Q.  Do you have a copy of it as it existed at the
23  time you began to use VoiceBlaze?
24   A.  It didn't -- it never changed.
25    MR. WILLIAMSON:  I want to get a copy.

**Page 35**

1  I would like to see it, and I'm wondering how --
2    MR. PEABODY:  Charles, can you provide
3  that.
4   A.  I can get you a copy.
5   Q.  All right.
6    And do you recall that that list indicated
7  that ADADs were not to be made to Washington?
8   A.  Absolutely.  When you see the list,
9  you'll know.  It has restrictions, it has civil or
10  criminal violations, within what states they are and
11  aren't.
12   Q.  No, I'm interested because I've seen lists
13  from other outfits in this business that were produced
14  where Washington was not on the list, and so obviously
15  people interpret the laws differently and that's fine.
16    You read this to mean calls shouldn't be
17  made to Washington, correct?
18   A.  Correct.
19   Q.  How did you then make sure that such calls
20  didn't get made, that such calls were not made?
21   A.  Say that again.  Can you repeat that question
22  for me.
23   Q.  How would you make sure, when you were
24  using VoiceBlaze, that calls would not be made to
25  Washington?

**Page 36**

1   A.  Correct.
2   Q.  How would you --
3   A.  I blocked Washington State from ever
4  being called.  No matter if it was a -- Pacific Coast
5  data that was being entered by VoiceBlaze, it couldn't
6  trump me putting that state on that -- a do-not-call
7  state into the system.  So it would automatically
8  block out every area code in the state of Washington.
9   Q.  Was this something you did when you
10  were first setting up the interface with VoiceBlaze?
11   A.  Yeah, yes.
12   Q.  So you did it that first time, and then just
13  assumed, as I think you certainly would have been
14  entitled to, that that would remain in effect the
15  whole time you would use VoiceBlaze?
16   A.  It's embedded.
17   Q.  I'm not sure what you --
18   A.  You can't remove it.
19   Q.  Pardon me?
20   A.  You can't remove it.  You set rules, and the
21  rule is that if Washington State is a state that don't
22  I want to be called, it will not be called.
23  It's "embedded."  It's a rule that I create in the
24  interface.
25   Q.  Are you able to produce reports or data today

**Page 37**

1  that would tell you the area codes of all persons,
2  throughout the time you made campaigns, who pressed
3  the prompt to be connected to your company to get more
4  information?
5   A.  From VoiceBlaze you say?
6   Q.  No, from yourself.  Do you have that
7  information?
8   A.  As far as inbound traffic is concerned?
9   Q.  Yes.
10   A.  I'm not too sure that I can do that myself,
11  but I don't -- I don't know if I can answer that
12  question.  I don't know if I can provide data for
13  since I opened my doors until now for everybody that
14  called in to our operation.  I'm sure that if I called
15  my phone company I could.
16   Q.  I'm trying to determine if you would have
17  any way of determining, based upon using VoiceBlaze
18  only, the phone numbers of persons who, receiving that
19  ADAD, would have pressed the prompt to permit them to
20  talk with somebody at your company.
21   A.  I don't have that information.
22   Q.  Is it available or you just don't have it?
23   A.  I don't have the information because --
24  I think we just went over this -- basically I can't
25  get in to query or look back into a system that I

10 (Pages 34 to 37)